UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **ZACHARY ANDREW STINSON**<br>**REG. # 77604-061** | **DOCKET NO. 2:23-cv-0751**<br>**SECTION P** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **FELIPE MARTINEZ, JR.** | **MAGISTRATE JUDGE LEBLANC** |

## REPORT AND RECOMMENDATION

Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2241 by pro se petitioner Zachary Andrew Stinson on June 5, 2023. Doc. 1. Stinson is an inmate in the custody of the Bureau of Prisons ("BOP"), currently incarcerated at the Federal Correctional Institute at Oakdale, Louisiana ("FCIO"). The Warden filed a response/Motion to Dismiss the Petition on October 4, 2023. Doc. 6. Petitioner filed a reply to the Warden's response on October 19, 2023. Doc. 7. On September 11, 2024, Petitioner filed a Motion to Supplement the Record (doc. 15), which has been granted (doc. 20) following the Warden's response to the motion (doc. 17) and Petitioner's reply to the response (doc. 18). The matter is now ripe for review.

This matter has been referred to the undersigned for review, report, and recommendation in accordance with 28 U.S.C. § 636 and the standing orders of this court. For the reasons stated below, **IT IS RECOMMENDED** that the instant petition be **DENIED** and **DISMISSED**.

### I.
### BACKGROUND

Zachary Andrew Stinson was sentenced in the Southern District of Ohio on December 18, 2019. Doc. 1, p. 1. He is serving a 132-month sentence for violation of 18 U.S.C. § 2423(b), Transportation of Minors – Travel with Intent to Engage in Illicit Sexual Conduct. *See* doc. 6, att. 2, p. 2, Declaration of Tamala Robinson, Att. 1, Public Information. Through the instant petition

he asks this Court to direct the BOP to recalculate his FSA Time credits to include the period between December 18, 2019, and November 5, 2020, at the "proper" rate of 15 days for every 30 days of participation. Doc. 1, p. 7.

While other issues are raised and addressed throughout the briefs filed, the Petitioner's final filing, his Reply to the Respondent's Response to his Motion to Supplement, establishes that the only claim remaining before the Court is that the BOP has improperly denied Petitioner credits for the period between December 18, 2019, and November 5, 2020. Doc. 18, p. 3.

## II.
## LAW & ANALYSIS

A § 2241 petition on behalf of a sentenced prisoner "attacks the manner in which a sentence is carried out or the prison authorities' determination of its duration." *Pack v. Yusuff,* 218 F.3d 448, 451 (5th Cir. 2000). To prevail, a § 2241 petitioner must show that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).

### A. Exhaustion

Under 18 U.S.C. § 3585(b), the authority to grant or deny sentencing credit is specifically reserved to the United States Attorney General and delegated to the BOP. *United States v. Wilson*, 112 S.Ct. 1351, 1353–54 (1992). A district court may review a challenge to the BOP's refusal to grant credit for time served or make a nunc pro tunc designation through a § 2241 petition, but only after the BOP has a made a final decision on same. *See Pierce v. Holder*, 614 F.3d 158, 160 (5th Cir. 2010).

Pursuant to long-established Fifth Circuit law, "federal prisoners must exhaust 'administrative remedies before seeking habeas relief in federal court under 28 U.S.C. § 2241.'" *Mayberry v. Pettiford*, 74 F. App'x. 299, 299 (5th Cir. 2003) (per curiam) (quoting *Fuller v. Rich,* 11 F.3d 61, 62 (5th Cir. 1994)). *See also Rourke v. Thompson*, 11 F.3d 47, 49 (5th Cir. 1993);

*United States v. Gabor*, 905 F.2d 76, 78 n.2 (5th Cir. 1990). Proper exhaustion is required, meaning that the inmate must not only pursue all available avenues of relief but must also comply with all administrative deadlines and procedural rules. *See Woodford v. Ngo*, 548 U.S. 81, 90–91(2006) (the Court held that proper exhaustion is mandatory under the Prisoner Litigation Reform Act ("PLRA")). Because exhaustion is an affirmative defense, the party moving for summary judgment has the burden to demonstrate that the inmate failed to exhaust available administrative remedies. *See Stout v. North-Williams*, 476 F. App'x 763, 765 (5th Cir. 2012)(citing *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010)). The Fifth Circuit has held that summary judgment, not Rule 12(b), is the proper procedure for raising failure to exhaust as a defense when courts rule on exhaustion on the basis of evidence beyond the pleadings. *See Dillon*, 596 F.3d at 271.

Petitioner was required to exhaust administrative remedies prior to filing his habeas appeal unless extraordinary circumstance exist to prove the process is futile. *See Mayberry v. Pettiford*, 74 F. App'x. 299, 299; *Montoya v. Fleming*, 121 F. App'x 35, 36 (5th Cir. 2005), *Anderson v. Fleming*, 79 F. App'x 4 (5th Cir. 2003). The Petitioner bears the burden of showing the futility of exhaustion. *Fuller v. Rich*, 11 F.3d at 62.

The BOP has established an administrative remedy procedure through which an inmate can seek review of a complaint regarding any aspect of his imprisonment. See 28 C.F.R. §§ 542.10 through 542.19. Before initiating the administrative remedy process, an inmate must first attempt to resolve his complaint informally. 28 C.F.R. § 542.13. "The deadline for completion of informal resolution and submission of a formal written Administrative Remedy Request, on the appropriate form (BP-9), is 20 calendar days following the date on which the basis for the Request occurred." 28 C.F.R. § 542.14(a).

If an inmate is dissatisfied with the Warden's response to the BP-9, he may submit an Administrative Remedy Appeal (BP-10) to the Regional Director "within 20 calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a). Generally, the Regional Director has 30 days to respond, with a potential extension of an additional 30 days. See 28 C.F.R. § 542.18. If dissatisfied with the Regional Director's response, the inmate may finally file an Administrative Remedy Appeal (BP-11) to the General Counsel in the Central Office of the BOP "within 30 calendar days of the date the Regional Director signed the response." 28 C.F.R. § 542.15(a). The General Counsel then has 40 days to respond, with the potential extension of an additional 20 days. See 28 C.F.R. § 542.18. This is the final level of administrative appeal.

Petitioner claims to have complied with this requirement by filing a BP-9 (1140842-F1), a BP-10 (1140842-R1), and a BP-11 (1140842-A1). The Respondent agrees that on November 10, 2022, Petitioner filed the BP-9, 1140842-F1, challenging the calculation of FSA Time Credits. Following the Warden's response, Respondent agrees that Petitioner filed a BP-10 (1140842-R1), which was received by the Regional Office on December 15, 2022. While Petitioner concedes that the Regional Director's Response to his BP-10 was signed on February 24, 2022 (doc. 1, att. 2, p. 5), he specifies that he did not *receive* the response until after March 7, 2022. *Id*. He correctly points out that after 60 days, he was allowed to "consider the absence of a response to be a denial at that level." 28 C.F.R. § 542.18. This allows an inmate to proceed to the next level of review. Prior to receiving the BP-10 response Petitioner filed a BP-11 (1140842-A1). The BP-11 was received by the Office of General Counsel on March 20, 2023.

The Respondent and Petitioner disagree as to the facts surrounding the final step in the procedure. That Petitioner filed a BP-11 is not in dispute. However, Petitioner claims not to have received a response to his BP-11. In response to this allegation, the Respondent provides BOP

records which indicate that the BP-11 was rejected with the Codes RAP and RSA, which means Petitioner would have been provided a rejection notice, with the following messages:

> YOU DID NOT PROVIDE A COPY OF THE ATTACHMENT(S) TO YOUR REGIONAL APPEAL. YOU MAY RESUBMIT YOUR APPEAL IN PROPER FORM WITHIN 15 DAYS OF THE DATE OF THIS REJECTION NOTICE.

*See* Robinson Decl., Att. 4, TRM 1301.02, Part 2, Section E, page e-4.

Petitioner adamantly contends that he did not receive notice that the BP-11 was rejected. Doc. 7, p. 2. While the Respondent provides the entry of a rejection via the SENTRY computer system, Stinson notes that inmates do not receive their notifications electronically; rather, they wait for the paper notification to be given to them at the institution and are required to sign a log of delivery. *Id*. He points out that the Respondent provides no evidence that any delivery or attempted delivery was made and in further support, he notes that the log maintained at the unit establishes that while he signed for his BP-9 and BP-10 rejections, he never signed for the alleged BP-11 rejection notice. *Id*.

Based on the facts before it, the Court does not believe that Stinson abandoned the administrative remedy process and will address his claim that the BOP has improperly denied him time credits for the period between December 18, 2019, and November 5, 2020, on the merits.

**B. First Step Act**

    **a. Accruing Time Credits**

The First Step Act (FSA) authorizes the BOP to grant Federal Time Credits (FTC or "FSA Time Credits") to eligible inmates. *See* 18 U.S.C. § 3624(g). "An eligible inmate… may earn FSA Time Credits for programming and activities in which he or she participated from December 21, 2018, until January 14, 2020," and "may earn FSA Time Credit if he or she is successfully participating in [Evidence-based Recidivism Reduction (EBRR)] programs or [Productive

Activities (PAs)] that the BOP has recommended based on the inmate's individualized risk needs assessment on or after January 15, 2020." 28 C.F.R. § 523.42(b) (emphasis added).

An inmate does not start earning FSA Time Credits until after he arrives at his designated facility. 28 C.F.R. § 523.42(a). After arrival, the inmate's PATTERN score and needs assessments (SPARC-13) are completed. The SPARC-13 should be completed within 30 days. If the inmate fails to complete any portion of the SPARC-13, he will be considered to have opted out and will not earn FSA Time Credits until he completes the SPARC-13. Using the results of the SPARC-13, BOP staff recommend programming. If the inmate declines a recommended program or productive activity, he will be considered to have opted out and will not earn FSA Time Credits. Otherwise, he will be placed in the program, or on a waitlist.[1] *See* Program Statement 5410.01, <u>First Step Act of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4)</u> at 8 (available at www.bop.gov).

As a default, all inmates eligible to earn FTC are awarded 10 days for every 30 days of programming: "A prisoner shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities." 18 U.S.C. § 3632(d)(4)(A)(i). Some inmates may qualify to earn an additional five days per month:

> A prisoner determined by the Bureau of Prisons to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

18 U.S.C. § 3632(d)(4)(A)(ii); see also 28 C.F.R. § 523.42(c). An inmate's initial assessment is completed at the Initial Classification, which typically occurs 28 days after the inmate's arrival to his designated facility. *See* Program Statement 5410.01 at 9. After an inmate's first assessment is

---

[1] An inmate who is on a waitlist is deemed to be successfully programming for purposes of FSA Time Credits.

completed, reassessments are completed "at each regularly scheduled Program Review throughout the remainder of the inmate's incarceration." *Id.* at 9. Program Reviews occur "at least once every 180 calendar days. When an inmate is within twelve months of the projected release date, staff will conduct a program review at least once every 90 calendar days." 28 C.F.R. § 542.11(a)(2). Therefore, the earliest that an inmate can start earning at the higher 15 credit rate is at the second assessment, which occurs approximately 208 days after the inmate's arrival to his designated facility (28 plus 180 days).

### b. Applying Time Credits

The First Step Act authorizes the BOP to apply FSA Time Credits to an eligible inmate's sentence:

> Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release. The Director of the Bureau of Prisons shall transfer eligible prisoners, as **determined under section 3624(g),** into prerelease custody or supervised release.

18 U.S.C. § 3632(d)(4)(C) (emphasis added).

While this language uses terms like "shall", the language is not absolute. Instead, the inmate may apply earned credits only if eligible to do so, as determined by the BOP. *See* 18 U.S.C. § 3624(g). If an inmate has earned credits equal to the remainder of the inmate's sentence, 18 U.S.C. § 3624(g)(1)(a), and otherwise meets the eligibility criteria laid out in 18 U.S.C. § 3624(g)(1), then the prisoner is eligible to have credits applied to prerelease custody and/or early transfer to supervised release. 18 U.S.C. § 3624(g)(2). BOP is granted discretion to allocate these credits to either prerelease custody or supervised release. See 18 U.S.C. § 3632(d)(4)(C). Congress defines pre-release custody as home confinement (HC) or placement in a residential reentry center ("RRC" or "halfway house"). 18 U.S.C. § 3624(g)(2). Although Congress has thus authorized the

BOP to utilize either or both of these types of pre-release custody, it does not define when one should be used rather than the other. Instead, this is left to the discretion of the BOP. Notably, a transfer to prerelease custody does not terminate an inmate's confinement. Instead, this is merely a transfer to a lower level of confinement, as generally authorized by 18 U.S.C. § 3621(b) ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment…"). Ultimately, he must continue his pre-release custody until his sentence is satisfied.

Second, assuming an inmate has a term of supervised release as part of his sentence, the BOP may apply some of his Federal Time Credits to transfer (in effect release) the inmate to begin his term of supervised release up to twelve months early:

> If the sentencing court included as a part of the sentence a requirement that the prisoner be placed on a term of supervised release after imprisonment pursuant to § 3583, the Director of the Bureau of Prisons may transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of time credits under 3632.

18 U.S.C. § 3624(g)(3); *see also* 28 C.F.R. § 523.44(d) (stating that BOP may apply FSA Time Credits toward early transfer to supervised release "no earlier than 12 months before the date that transfer to supervised release would otherwise have occurred.").

Unlike prerelease custody, a transfer to begin supervised release is in effect an early release. The BOP has exercised this discretion to apply the first 365 FSA Time Credits to early release (early transfer to supervised release). *See* Program Statement 5410.01 at 16 (for inmates meeting eligibility criteria, "up to 365 days of earned FTCs will be automatically applied to early release") (available at www.bop.gov). This maximizes the early release benefit to eligible inmates.

c. **Petitioner's Time Credits**

Petitioner's most recent FSA Time Credit Assessment, dated September 5, 2024, indicates that he started earning Time Credits on November 5, 2020, the date on which he arrived at his

designated facility. Doc. 17, att. 2, p. 1. He earned at a rate of 10 days per month from November 5, 2020, through June 1, 2021. *Id*. At that point, BOP increased his earning rate to 15 days per month, and he has earned at that rate since then, giving him the benefit of having received his second LOW risk assessment as of that date. *Id*. In total, Petitioner has earned, as of September 5, 2024, 660 credits, of which 365 days can be applied towards early release (early transfer to supervised release), and the remaining 295 days are available to be applied toward transfer to a Residential Reentry Center ("RRC"). *See id*. This means Petitioner currently has accrued enough credits for transfer to an RRC on approximately September 23, 2025[2]. Any earlier transfer would be under the authority of the Second Chance Act, which authorizes, <u>but does not require,</u> BOP to place an inmate into community confinement for up to 12 months. *See* 18 U.S.C § 3624(C).

Petitioner's claim relies on the idea that the First Step Act requires BOP to allow him to start earning time credits on the day he is sentenced, and that 28 C.F.R. § 523.42(a) is therefore unlawful (an inmate does not start earning FSA Time Credits until after he arrives at his designated facility). The FSA does not mandate that an inmate begin earning time credits as soon as the

---

[2] At the bottom of the time credit assessment form is a new section called "Planning." *See* doc. 17, att. 1, Decl. of Christine Wohld. This section is meant as a planning tool to inform inmates of the number of credits they are projected to earn if they earn credits at the maximum possible rate. *Id*. According to Wohld, the Correctional Programs Administrator for the South Central Region of the BOP, the formula in the BOP calculation system is not yet correct and was released on the recent FSA Time Credit Assessments in error, resulting in an erroneous projection. *Id*. Specifically, the incorrect formula projects the inmate earning 15 credits per 30 days all the way through July 15, 2026, when Stinson is *projected* to release from custody. *Id*. From September 2024 through July 15, 2026, there are 22 programming periods (30 days each). *Id*. At 15 credits per period, this represents 330 credits which, added to the 295 credits that Stinson already has available for an RRC placement, amounts to 625 credits and a projected conditional placement date of October 28, 2024. *Id*. This calculation is an error. *Id*. Legally, credits can only be accrued each time an inmate completes 30 days of successful programming. *See* 18 U.S.C. § 3632(d)(4)(A). Furthermore, BOP applies FSA credits only when the inmate has accrued credits "in an amount equal to the remainder of the prisoner's-imposed term of imprisonment." *See* 18 U.S.C. § 3624(g)(1)(A)). The earliest Petitioner will have earned credits in the amount equal to his remaining sentence would be May 26, 2025. Only at that point may credits be applied to his sentence. There is no legal basis for BOP to award or apply credits at an earlier time for programming that has not yet been completed. BOP is currently working to correct this error in the calculation system. *Id*. In this case, Stinson's projected transfer to an RRC on May 7, 2025, accounts for all the FSA credits he has earned, and is projected to earn, including an additional period under the Second Chance Act.

sentence commences. Instead, it provides that a prisoner's ability to earn credits does not begin until his sentence commences. Specifically, the FSA provides:

> (B) Availability. – A prisoner may not earn time credits under this paragraph for an evidence-based recidivism reduction program that the prisoner successfully completed – (i) prior to the date of enactment of this subchapter; or (ii) during official detention prior to the date that the prisoner's sentence commences under section 3585(a).

18 U.S.C. § 3632(d)(4)(B).

Furthermore, 18 U.S.C. § 3585(a) provides that a sentence commences when "the defendant is received in custody awaiting transportation to… the official detention facility at which the sentence is to be served." Pursuant to this section, an inmate detained under the primary jurisdiction of the federal government during criminal proceedings begins her term of imprisonment on the day the sentence is imposed. Therefore, read in conjunction with § 3632(d)(4)(B)(ii), the FSA prohibits a prisoner from earning credits for any time prior to the day he is sentenced.

However, even though Petitioner is statutorily eligible to earn time credits as of December 18, 2019, the BOP's final FSA regulations established the point when an inmate would begin earning credit, rather than defining when an inmate would not earn credits (as the statute did). Specifically, the regulation provides, "[a]n eligible inmate begins earning FSA Time Credits after the inmate's term of imprisonment commences (the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the sentence will be served)." 28 C.F.R. § 523.42(a) (emphasis added). While the Respondent concedes that the regulation could admittedly be worded more artfully, none of the more than 250 public comments received by the BOP prior to publishing the final regulations suggested that this regulation ran contrary to statutory intent. Use of the word "after" as opposed to "on the date," or similar language, demonstrates a clear

understanding of the interplay between the date a sentence commences under § 3585(a) and the date the BOP established for eligible inmates to begin earning FSA Time Credits. The language in 28 C.F.R. § 523.42(a) stating in parenthesis, "the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the sentence will be served" should not be read to misinterpret the date on which a sentence commences under § 3585(a). Rather, it should be read as a point of clarification as to when an eligible inmate begins earning FSA Time Credits after their sentence commences. Petitioner relies on *Yufenyuy v. Warden, FCI Berlin*, 2023 WL 2398300 (D. N.H. Mar. 7, 2023) for the proposition that an inmate must start earning credits as of the date his sentence is imposed. The *Yufenyuy* court, and by extension Petitioner, conflates §§ 3632(d)(4)(A) and (d)(4)(B). Section (d)(4)(A) explains how a prisoner earns credits (i.e. by successful completion of evidence-based recidivism reduction programs ("EBRR") and productive activities ("PAs")). It also explains how many credits a prisoner can earn (i.e. 10 or 15, depending on their assessed recidivism risk). Accordingly, Section (d)(4)(A) creates affirmative duties required of the BOP (a "prisoner . . . shall earn time credits as follows . . .").

On the other hand, Section 3632(d)(4)(B) describes what the BOP cannot do (i.e. award credit for programming prior to the date an inmate's sentence commences under § 3585). However, it does not dictate what the BOP *must* do. Congress could have easily legislated that an inmate begins earning credit the day his sentence commences under § 3585. However, Congress did not do that. Instead, Congress created a floor, legislating that an inmate cannot begin earning credit earlier than a particular date. Thus, contrary to the *Yufenyuy* court's interpretation, the FSA does not provide that prisoners must begin receiving credit upon the commencement of a sentence. There are several practical reasons for this – including that prisoners are often not in BOP custody at the time of sentencing and are instead in a local facility which may not be the final designated

-11-

facility. It is well settled that the BOP "shall designate the place of the prisoner's imprisonment." 18 U.S.C. § 3621(b). *See also United States v. Quinones-Melendez*, No. 99-2072, 229 F.3d 1134 (unpublished), 2000 WL 1160448, at *1 (1st Cir. July 13, 2000) ("[T]he authority to assign prisoners to particular facilities lies solely with the Bureau of Prisons."). In making the designation, the BOP must consider the resources of the facility contemplated; the nature and circumstances of the prisoner; the history and characteristics of the prisoner; statements made by the sentencing court; and pertinent policy statements issued by the Sentencing Commission. 18 U.S.C. §§ 3621(b)(1)–(5). Indeed, relevant considerations include "bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons." 18 U.S.C. § 3621(b).

Once an individual is sentenced, the DSCC gathers material from the sentencing court, the U.S. Marshals Service, the U.S. Attorney's Office or other prosecuting authority, the U.S. Probation Office, and other sources as necessary (e.g. state courts/correctional agencies, outside medical or mental health care providers, etc.). *See* Program Statement 5100.08, Inmate Security Designation and Custody Classification, Ch.3 (available at www.bop.gov). Only at that point does the BOP have sufficient information to determine all the factors described in §§ 3621(b)(1)–(5) and Program Statement 5100.08. After acquiring a more robust picture of the prisoner, the BOP then assigns the prisoner to a facility commensurate with his needs. Accordingly, BOP has little to no information about prisoners and cannot complete the PATTERN and begin EBRR or PAs until the individual reaches the designated facility.

As explained by the Respondent, the complex designation process highlights the reasoning behind 28 C.F.R. §523.42(a). Prior to arriving at their designated facility, prisoners will not have

completed their PATTERN risk assessment or their needs assessments. Without the needs assessment, BOP does not know which EBRR programs or PAs are appropriate for the prisoner. While it is true that inmates may receive credit for completing programs other than those specifically recommended for them, they must simultaneously be working toward completion of their recommended programs. *See also* BOP's Response to Comments on Proposed Rule, 87 Fed. Reg. 2705, 2711 (Jan 19, 2022) ("[U]nless the inmate formally declines recommended programming addressing his or her unique needs, or is not participating in any activities, the assumption is that the eligible inmates will be earning Time Credits and fully participating in recommended programming.").

Because Petitioner did not undergo a risk and needs assessment until he arrived at his designated BOP facility, it follows that he could not have "successfully participated" in any recommended programming before that time. *See, e.g., Poff v. Carr,* No. 4:21-CV-900-P, 2022 U.S. Dist. LEXIS 105724, 2022 WL 2133871, at *5-6 (N.D. Tex. June 14, 2022) (unpublished) ("[A]ny program or activity that [petitioner] seeks FSA time credits for must be approved by the BOP and be assigned to her based on her specific criminogenic needs"); *Hare v. Ortiz,* Civ. No. 20-14093 (RMB), 2021 U.S. Dist. LEXIS 21270, 2021 WL 391280, at *9 (D.N.J. Feb. 4, 2021) (unpublished) ("Time [c]redits are earned only when an inmate successfully completes one of the BOP-approved EBRR programs or PAs related to one of the particular needs assigned to that inmate."); *Milchin v. Warden*, No. 3:22-cv-195 (KAD), 2022 U.S. Dist. LEXIS 93640, 2022 WL 1658836, at *3 (D. Conn. May 25, 2022) (unpublished)  ("[A] prisoner may earn time credits only for completing programs to which he has been specifically assigned based on his particular recidivism risk.").

To allow an inmate to earn time credits outside of the system established by the FSA would essentially void large portions of the FSA and render them meaningless. Considering the above analysis, the BOP must reasonably wait until the inmate is at the designated facility before awarding time credits. The BOP is responsible for administering FSA provisions relating to time credits, and it stands to reason that BOP facilities would need to know both the inmate and the EBRR programming and PAs provided by that particular institution to determine eligibility for, and application of, time credits. The Court should defer to the BOP on this matter and deny Petitioner's demand to award him additional credits.

### III.
### CONCLUSION

Stinson has not been denied any FSA Time Credits and, as such, fails to state a claim for relief under 28 U.S.C. § 2241. Accordingly,

**IT IS RECOMMENDED** that the petition be **DENIED** and **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that all pending motions be **DENIED** as **MOOT**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon

grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429–30 (5th Cir. 1996).

      **THUS DONE AND SIGNED** in chambers this 11th day of November, 2024.

_____
THOMAS P. LEBLANC
UNITED STATES MAGISTRATE JUDGE